## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| Tim L. Wallace and | } | CASE NO. 15-41554-JJR7 |
| Becky A. Wallace, | } | |
| | } | |
| Debtors. | } | |

---

| | | |
|---|---|---|
| Automation Support, Inc. | } | |
| d/b/a Technical Support | } | |
| and Soyokaze, Inc., | } | |
| | } | |
| Plaintiffs, | } | |
| v. | } | AP NO. 16-40025-JJR |
| | } | |
| Becky A. Wallace, | } | |
| | } | |
| Defendant. | } | |

## <u>MEMORANDUM OPINION</u>

### <u>Introduction</u>

Automation Support, Inc. d/b/a Technical Support ("Support") and its sister corporation, Soyokaze, Inc. ("Soyokaze" and together with Support, the "Plaintiffs"), alleged that their former employee and human resources coordinator, Becky Wallace (a co-debtor in the underlying bankruptcy case and herein, "Becky"), willfully and maliciously abused her human resources responsibilities, causing them to suffer substantial damages.  Central to the Plaintiffs' allegations were claims that Becky intentionally mishandled a sexual harassment claim against the husband of the Plaintiffs' chief executive officer, and that Becky knowingly provided misinformation to an employee regarding his unused vacation time for which he later sought compensation, albeit

unsuccessfully. The Plaintiffs claimed that pursuant to § 523(a)(6) of the Bankruptcy Code,[1] Becky's liability for their damages should not be discharged in her chapter 7 bankruptcy case.

After three days of trial, during which the court heard the testimony of the parties and other witnesses, and reviewed multiple exhibits and deposition testimony, the court has concluded that there was indeed a willful and malicious injury, but *not* caused by Becky. Contrary to the Plaintiffs' allegations, Becky was the victim of the willful and malicious conduct perpetrated by the Plaintiffs at the hands of their owners and executive officers, Renee McElheney ("Renee") and her husband, Billy McElheney ("Billy" and together with Renee, the "McElheneys"). The McElheneys adhere to the adage that the best defense is a good offense, and their offense, wantonly directed at Becky, was pursued in bad faith. Simply put, the McElheneys were vexatious bullies. They prosecuted this adversary proceeding for oppressive reasons, in a selfish attempt to distract attention away from Billy's aggressive and boorish behavior toward a subordinate female employee. Below is an account of the Plaintiffs' and the McElheneys' sordid scheme to cast blame on Becky for their self-inflected woes.

## Jurisdiction

The court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference, as amended, entered by the United States District Court for the Northern District of Alabama.[2] Title 28 U.S.C. § 157(b)(2)(I) provides that the "determination as

---

[1] 11 U.S.C. § 101, et seq., and herein referred to as the "Code." Code § 523(a)(6) provides that, "A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for willful and malicious injury . . . ."

[2] In their response and briefs (Docs. 61, 62, 63) opposing Becky's motion for summary judgment (Doc. 49), the Plaintiffs argued that if they prevailed in this court on the issue of nondischargeability, the court did not have jurisdiction to determine damages, and that the amount

to the dischargeability of particular debts" is a core proceeding. Thus, the court has authority to enter a final order as to all aspects of this adversary proceeding. This opinion shall constitute the court's findings and conclusions[3] as required by Rule 7052,[4] and a separate judgement and order conforming to this opinion will be entered pursuant to Rule 7058.

## **Findings of Fact**

### 1-*Support and the McElheneys*

Support was founded in 1997. Its principal and apparently only place of business is located in Midlothian, Texas, a small town about sixty miles south of Dallas. Support provides automation support and systems integration to the food industry for numerous customers throughout the United States and beyond. Many of its customers are Fortune 500 companies. Support has always been owned and controlled by the McElheneys. Renee was the chief executive officer and managed the inter-office affairs, while Billy worked with the engineers—or integrators, as the parties often

---

of damages should be adjudicated by a jury in an action previously commenced by the Plaintiffs against Becky in the U. S. District Court for the Northern District of Texas. The Texas action was based on facts similar to those alleged in this adversary proceeding. (*See* complaint filed in the Texas district court attached as an exhibit to the original adversary complaint at AP Doc. 1.) A magistrate judge in the Texas action dismissed Becky with leave to reinstate her as a party depending on the resolution of her bankruptcy case. Citing *Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473 (5th Cir. 2009) and *Markwood Invs. Ltd. v. Neves (In re Neves)*, 500 B.R. 651 (Bankr. S.D. Fla. 2013), this court held that it had jurisdiction to liquidate claims and decide the issue of damages in an action seeking a determination of nondischargeability brought under Code § 523(a). That jurisdictional issue, if there ever was one, is now rendered moot with the ruling in this adversary proceeding that there never was a debt owing by Becky to the Plaintiffs, much less a debt that might be nondischargeable under Code § 523(a).

[3] To the extent any of the court's findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the court's conclusions of law constitute findings of fact, they are adopted as such.

[4] Reference herein to a "Rule" is a reference to a Federal Rule of Bankruptcy Procedure.

referred to them—and ran the technical and customer service side of the business. The McElheneys were longtime residents of Midlothian and were extensively involved in its civic and business matters, and were active in a local church.

## 2-*Becky*

Becky and her husband, Tim Wallace ("Tim" and together with Becky, the "Wallaces"),[5] like the McElheneys, were longtime residents of Midlothian, and both families attended the same church. Tim was an associate pastor at the church, and among other duties, was responsible for the youth ministry. He also conducted retreats and counseling sessions in which Billy participated. The McElheneys and the Wallaces were good friends; they frequently socialized, ate together in their homes, vacationed together, and attended the same church functions.

Before her employment with Support, Becky assisted her husband at the church, but in 2004, Support hired her as an administrative assistant to help Renee. When Becky started with Support, it had nine other employees, and her duties were diverse.[6] Primarily, she was Renee's general assistant and did whatever was needed, including answering the phone, cooking lunch, and later doing laundry. Over time she began handling human resources ("HR") matters, and during March 2008, Support sent her to a one-week HR seminar. (Plaintiffs' Ex. 79.) At the end of the seminar, Becky received a certificate of completion and Support designated her as its HR coordinator. (Plaintiffs' Ex. 50, § 1:2.)

---

[5] Throughout the trial, the McElheneys, the Wallaces, and their counsel referred to the McElheneys and Wallaces by their first names, i.e., Billy, Renee, Becky, and Tim. And Jayme Rankin, a critical deposition witness—discussed *infra*—was also referred to by her first name. Without the intention of appearing informal, the court likewise has referred to these parties by their first names.

[6] When Becky resigned in May 2011, Support had grown to approximately 20 employees.

Case 16-40025-JJR   Doc 111   Filed 11/16/17   Entered 11/16/17 10:46:20   Desc Main
Document   Page 4 of 37

During her testimony, Renee attempted, unsuccessfully, to cast Becky as an HR expert with vast training and experience, when in actuality, Becky's HR responsibilities were limited to keeping track of vacations and paid time off, and assisting a handful of employees in a small office with their employee-benefits matters, although on one occasion Becky was involved in an employee termination, the grounds for which were not sexual harassment. Until the episode involving Billy and a female employee that culminated in the employee's resignation and filing a sexual harassment lawsuit, Becky was never confronted with a sexual harassment complaint, much less such a complaint directed against the husband of Becky's immediate boss—a boss who was a close friend, fellow church member, and the CEO of Becky's employer.[7]

After Becky became Support's HR coordinator, she and the McElheneys prepared an Employee Handbook. (Plaintiffs' Ex. 50; the "Employee Handbook" or "Handbook.") The Employee Handbook was distributed to the employees in early 2009, years before any of the events giving rise to this adversary proceeding occurred; more about the Handbook later.

### 3-*Soyokaze*

The building in which Support's offices were located was vacant at one end, and in 2010 the McElheneys filled that vacancy with a massage spa. They incorporated under the name of Soyokaze, which was derived from a Japanese word meaning a breath of air or a gentle, calming breeze. The McElheneys explained their decision to fill the vacant space with a massage spa as an altruistic "endeavor[] to create a place where people could escape from the day to day world, relax, and find peace." (First Amended Complaint, AP Doc. 94, ¶13.) The McElheneys' explanation of why an engineering and technical logistics enterprise would choose to open an adjoining and

---

[7] Details of the sexual harassment complaint are addressed *infra*.

affiliated massage business was peculiar, especially in light of the five massage establishments that were already in the small town of Midlothian. Regardless, opening a massage spa turned out not to be such a good idea after all, and at least during the time in question, it certainly did not bring peace to the McElheneys.

In the Support building, the front door dedicated to the Soyokaze space was usually locked so no one could walk in off the street without an appointment. To enter the Soyokaze spa without an appointment, a visitor would need to enter the building through Support's main entrance and lobby. The space occupied by Soyokaze's therapists was easily accessible from Support's end of the building. Support staff could walk down the hall, go through the laundry room and into Soyokaze's lobby and private massage rooms where the therapists worked. Billy, Renee, Becky, and others frequently took advantage of the easy access.

Although Becky was not an employee of Soyokaze, she pitched in where needed, including serving as its de facto HR coordinator. Soyokaze's massage customers would often make appointments by contacting Becky at her Support office; she had both a Support phone and a Soyokaze phone on her desk, and she answered both as part of her job duties.

### 4-*Jayme Rankin*

Jayme Rankin ("Jayme"), a young woman fresh out of massage therapy school, began working at Soyokaze in February 2010. Renee and Billy hired Jayme as Soyokaze's only full-time therapist; two or three part-time therapist were also hired. The McElheneys and the Wallaces knew Jayme and her family—they all went to the same church together—and Becky had mentored Jayme at church while Jayme was in high school.

Jayme did not testify in person, but at the end of the trial, the parties stipulated that designated portions of Jayme's deposition ("Jayme's Deposition") testimony would be received

Case 16-40025-JJR    Doc 111    Filed 11/16/17    Entered 11/16/17 10:46:20    Desc Main
Document    Page 6 of 37

as evidence in this adversary proceeding. Jayme's Deposition was taken in the lawsuit she filed against Billy, Soyokaze, and Support in the State District Court for Ellis County, Texas (the "State Lawsuit"). The central claim in Jayme's State Lawsuit was for sexual harassment, and the Plaintiffs contended that the expenses they incurred in defending that suit, including their attorney's fees—but not including the monies paid to settle the case following mediation—were the result of Becky's intentional and malicious acts, not Billy's iniquitous behavior. Thus, it is necessary to review Billy's, Becky's, and even Renee's contributions to the events that provoked Jayme to file suit, and determine who was to blame for causing those damages. But first, to put matters in perspective, it is worthwhile to mention one missing piece in the evidentiary puzzle that was readily available to the Plaintiffs, but conspicuously never appeared.

Most of the designated portions of Jayme's Deposition testimony pertained to what occurred between Billy and her while she worked at Soyokaze, and in particular, the happenings during the last few months before she resigned. It was significant that Jayme's Deposition testimony, which the court found to be credible and consistent with other reliable evidence, was never rebutted or otherwise seriously challenged. Billy sat through the three-day trial of this adversary proceeding as one of the Plaintiffs' corporate representatives, and one of the central actors in the State Lawsuit and this adversary proceeding, but he never testified; he never denied Jayme's troubling account of what went on between him, a middle aged man, and Jayme, his much younger female employee. The Plaintiffs had the burden to persuade the court by a preponderance of the evidence to accept their argument that it was Becky's willful and malicious mishandling of the matter, rather than Billy's misbehavior, that caused their damages. Yet they failed to call as their witness the one person who, in addition to Jayme, had personal knowledge of the critical

Case 16-40025-JJR    Doc 111    Filed 11/16/17    Entered 11/16/17 10:46:20    Desc Main
Document      Page 7 of 37

events underlying the State Lawsuit—the one person who could have rebutted Jayme's Deposition testimony if it was not true.

Billy's wife, Renee, did testify, and her testimony was not so much a denial of her husband's aggressive conduct toward Jayme, but an implausible explanation of why Becky, rather than her husband, was the impetus for Jayme filing the State Lawsuit. Billy and Jayme know what happened behind closed doors at Soyokaze, but the only credible evidence offered to establish what actually occurred, and therefore what motivated the filing of the State Lawsuit and in turn necessitated the attorney fees sought as damages, was Jayme's firsthand account recorded in her deposition taken in the State Lawsuit, a lawsuit in which Billy, Support, and Soyokaze were her adversaries.

### 5-*Billy's Indiscretions*

After Jayme was hired at Soyokaze, and in particular during her last three months on the job, Billy began showing her an unusual amount of attention. As Jayme described it, Billy would single her out and tried to treat her more like a girlfriend than an employee. He would book frequent massages with her, but rarely the other therapists. The sheer volume of massages he booked with Jayme contributed to her perception that his attentions were focused on her, and were escalating. Although Billy's primary duties were at Support, during the months of January through May of 2011, Jayme felt like he was always at Soyokaze following her. If he could not find Jayme at Soyokaze, he would inquire where she was, and search her out. After a Soyokaze staff meeting at the McElheneys' home in April 2011, Billy insisted on following Jayme across the street to her parked car, opened the door for her, and complimented her on her scent, further fueling her sense that she could not get away from him. During the last few massages Jayme gave Billy, she noticed he had applied fragrance to his genitalia, and he would at times hold her hand to the point of

making her uncomfortable.  During the last few massages she gave him, Billy became aroused to a noticeable degree, despite being draped with a sheet and a blanket.  He arranged a special playlist of songs to play during his appointments with Jayme; he labeled the playlist with their initials "J and B" with a warning of "No Public Allowed."   The other therapists noticed the playlist and asked Jayme what was going on between Billy and her.   Jayme was embarrassed and uncomfortable that Billy was converting his massages into some sort of special occasions.  To avoid having to deal with Billy's cloying attentions, she began staying away from the spa unless she knew she had a scheduled client.  Sometimes she felt like she had to run away when she saw him coming her direction.  Billy noticed Jayme was quiet and frequently absent, and that she acted more and more uncomfortable around him.  Billy questioned her about what was wrong, asked her repeatedly if he had done something to make her mad, reassured her that he would do anything for her, and begged her not to leave the spa. The more he offered his inappropriately personal and clingy reassurances, the more Jayme determined to stay away.

The deciding moment came when Billy offered to give Jayme a shoulder and neck massage to alleviate a migraine headache about which she had been complaining.  It was not uncommon for Billy to demonstrate a new massage technique he had learned, as he saw himself as something of a student of massage.  He used that approach to convince Jayme to let him work on her back and shoulders promoting his new technique as a possible cure.  Unfortunately, after her initial refusal, she relented to his proposal.  She entered the massage room alone, and bared her back and shoulders with a blanket pulled up to the bottom of her back, lying face down on a heated table when Billy entered.  Billy was not content with her shoulders and neck as Jayme had specified, and went so far as to pull back the blanket and began to oil and massage her glutes below the waist under her clothing.  At first, Jayme froze in shock.  Then she recovered her wits enough to tell

Billy that they were done, she was all better, and that he needed to stop now. She did not confront him about his behavior at that time; she was alone with him, her boss, in an exposed and embarrassing situation that she had been pressured into accepting.[8]

After the "headache" massage, Jayme had reached her tipping point, and at a friend's recommendation, Jayme told Becky that she needed to talk to her privately, but not in the office.[9] That brief conversation was in Becky's Support office late in the afternoon on Friday, May 13, 2011. Becky offered to cancel her evening plans and stay late to discuss whatever was troubling Jayme, but Jayme was not comfortable being seen entering a closed-door meeting in Becky's office. Jayme was also concerned that she would become upset in the telling, and did not want to explain her emotions to anyone if she was seen leaving the office upset. They agreed to talk the next morning, a Saturday, because they already had plans to meet and discuss Jayme's upcoming wedding plans at that time.

They met at a local Starbucks coffee shop, but stayed in the car to avoid being overheard. They talked in the car over coffee for 15 or 20 minutes while Jayme explained to Becky that Billy had escalated from creepy attention to sexually harassing her at the spa. Becky had already noticed

---

[8] The detailed account of Billy's conduct that Jayme described in her deposition was not summarized in this opinion to prove Billy was in fact guilty of sexually harassing Jayme—that was beside the point. It bears repeating, however, that the Plaintiffs claim the losses they incurred in defending Jayme's State Lawsuit were caused by Becky's actions rather than Billy's. Thus, the court looked at both Billy's contribution to the Jayme debacle, as well as Becky's.

[9] Jayme knew that Billy and Renee owned and controlled Soyokaze, and were her immediate superiors. Although Becky was not a Soyokaze employee, Jayme considered Becky to be her superior and Soyokaze's de facto HR coordinator. Jayme also knew that Becky and the McElheneys were close personal friends, and she was somewhat intimidated to go to Becky with her complaints because Becky and the McElheneys were such good friends. The office environment was not perceived as particularly open or friendly, and the employees knew they could not bring some sensitive matters to Billy's and Renee's attention without fear of consequences, despite the otherwise openly affectionate way some of the people in the office interacted with each other.

the unusual attention Billy was giving Jayme, but after hearing all the sordid details from Jayme, Becky became upset and confused. Becky was hearing the details of Billy's alleged sexual misconduct for the first time from a young woman she had mentored in high school and who was now being ill-treated by the husband of Becky's immediate boss. This was not an employee complaint for which HR textbooks could plausibly suggest an easy resolution, and Renee admitted as much in her testimony.

Becky also realized she was in an untenable situation that could end with the loss of her job; she knew Billy and Renee would accept nothing less than Becky taking the position that Jayme was lying. At that Saturday morning meeting, Becky told Jayme that, while she would have to run it by Billy and Renee, she was sure they could set up Jayme's schedule so she did not have to do any more massages for Billy. Becky's concern for Jayme was because she was Jayme's friend and mentor, not just the HR coordinator of Jayme's employer. But Jayme had more disconcerting information for Becky.

### 6-*Undermining Becky's Authority*

In Jayme's Deposition testimony, she stated that Billy told her that he did not like Becky, and lacked confidence in her abilities. He also told Jayme that if she or the other therapists had any problems or issues, they should come directly to him and not Becky. In other words, Billy was telling a subordinate female employee, whom he was harassing, not to go to Becky, the HR coordinator, with complaints, but to come to him, the perpetrator of the harassment, for advice. These revelations made Jayme uncomfortable; she found it inappropriate for her boss—Billy—to share his negative opinion of someone she considered her superior—Becky—and sharing this confidential information furthered Jayme's perception that Billy was escalating his "special" treatment of her.

Case 16-40025-JJR   Doc 111   Filed 11/16/17   Entered 11/16/17 10:46:20   Desc Main
Document     Page 11 of 37

After her conversation with Jayme, Becky was justifiably uncertain about what to do next. In addition to hearing the sexual harassment allegations, Becky had just learned that Billy disliked her; lacked confidence in her job-related abilities; and he had told all this to a subordinate employee who was Becky's youthful protégé.[10]

### 7-*The Conflicted Messenger*

The Wallaces and McElheneys planned to eat pizza together at the Wallaces' home on the evening of the same day—May 14, 2011, a Saturday—that Becky and Jayme had had their talk at Starbucks. Wanting to buy time to consider how to approach the McElheneys with the unsettling news concerning Jayme, Becky sent Renee a text message cancelling their dinner date.[11] Becky's overriding concern was not that Billy had expressed a lack of trust in her abilities; it was that he did so in the context of instructing the female therapists, one of whom he was allegedly sexually harassing, to come to him rather than to Becky with their complaints or issues. In Becky's view, these instructions were troubling not only because of her pride but because of what it meant for the female employees and what is said about Billy's motives. Becky's confusion was compounded by the intertwined personal relationships among the parties, her firsthand observations of Billy's behavior toward Jayme, her awareness of the McElheneys' vindictive nature, and her very real

---

[10] Becky's testimony at trial corroborated Jayme's Deposition testimony with respect to what Jayme told Becky about Billy's derogatory comments about Becky. Jayme told Becky what Billy had said about her near the end of their Saturday morning meeting at Starbucks.

[11] That night, after cancelling dinner with the McElheneys, the Wallaces met with some close friends and fellow church members for emotional support but Becky shared no details of Jayme's allegations with them.

Case 16-40025-JJR   Doc 111   Filed 11/16/17   Entered 11/16/17 10:46:20   Desc Main
Document      Page 12 of 37

fear that taking a neutral stand on the allegations, as she felt she must, could result in the loss of her job.

On Saturday, Becky shared Jayme's allegations with her husband, Tim, and expressed her fear that she could lose her job. Tim reassured her that she was caught in the middle and that simply conveying the complaint and then dealing with it would pose no threat to her job. Becky knew better based on her knowledge of how the McElheneys did business, and knew if she did not immediately take Billy's side, and call Jayme a liar, it would not end well for her at Support. Tim encouraged Becky that she was running no risk by telling the McElheneys what Jayme had alleged—Becky was simply the messenger.

On Monday morning, May 16, Becky noticed that Billy was scheduled for a two-hour massage with Jayme later that day. Knowing Jayme would not give Billy another massage, Becky sent Renee an email message saying that Jayme had other business to attend to and would not be available to give Billy a massage. That same day, Becky went to see Support's lawyer and told him a Soyokaze employee had made a disturbing allegation against Billy, without giving the lawyer the full details. Becky hoped the lawyer could give her advice on how to proceed without her having to disclose all the sordid details of the allegations. The lawyer told Becky to follow Support's Employee Handbook in handling the matter.[12] On cross examination, Renee admitted that Becky going to Support's lawyer for advice was not consistent with her wanting to damage the Plaintiffs.

---

[12] Soyokaze did not have an employee handbook and Becky was not formally an employee of Soyokaze. However, Soyokaze did have an untitled document containing "expectations, policies, procedures and standards for [its] massage therapists, as well as [its other] employees . . . ." (Plaintiffs' Ex. 49, p.1.) This document provided, "Inappropriate touch or sexual misconduct is not allowed" and further said, "Sexual harassment will not be tolerated. Any instances should be reported immediately to the Administrator." (*Id*. p. 2.) No one was identified as the "Administrator" but Becky best fit the position, albeit unofficially.

The next day, Tuesday, May 17, after leaving work, Becky sent an email message to Renee saying she needed to talk with Billy and her about an important employee matter, and asked for a meeting. That evening, the McElheneys came to the Wallaces' home. The McElheneys agreed that Tim could stay in the room while Becky told them about Jayme's allegations. After brief small talk, Becky told Billy and Renee that Jayme had made sexual harassment allegations against Billy. About five minutes into the hour-long meeting, Renee announced she did not want to hear anything further, and abruptly left, leaving behind her purse and her husband. The remainder of the meeting took place without Renee.

Billy never denied the allegations during that meeting, which troubled Becky. Becky also confronted Billy toward the end of the meeting with the information from Jayme regarding his directive that the female massage therapists not report to Becky, but only to Billy. The conversation ended with Billy asking Becky what she intended to do about the allegations, and Becky responding that she was not sure what to do. Billy offered no advice.

Becky knew Jayme was waiting to find out what the next step would be, and she told her the meeting with the McElheneys had not gone well, which was perhaps an understatement in hindsight. Becky's intuition, as articulated by her counsel in opening statements, proved correct: This is a classic case of "shooting the messenger."

8-*Jayme's Resignation*

As mentioned, Renee left the meeting at the Wallaces' after hearing only the first five minutes of Becky's report about Jayme's allegations against Billy. Nonetheless, Renee stayed long enough to know that Jayme was claiming sexual harassment, but what, if anything, Billy later told Renee about all of Jayme's allegations, as relayed by Becky, was not clear.

14

The next morning, Wednesday, May 18, Renee sent an email message to Becky asking if she knew what Jayme's plans were. Becky said that she did not know, and suggested that Renee reach out and contact Jayme. Renee attempted to set up a meeting with Jayme, but Renee told Jayme that she did not want Becky to attend the meeting. Jayme refused to meet with either or both of the McElheneys without Becky also being present, and did not respond to Renee's request for a meeting because it would have excluded Becky.

Previously, Becky told Jayme that if she would stay at Soyokaze, an accommodation could be arranged where she would not have to give massages to Billy or have private conversations with him, and Becky told Renee about the offered accommodation. Becky explained in her email message to Renee that because an accommodation was offered, "She [Jayme] cannot say that she was fired or that she was not given options to continue employment should she desire to do so." The accommodation offered by Becky, although illustrating her genuine efforts to protect the Plaintiffs and Billy, and resolve an inimical situation, did not entice Jayme to stay. Jayme called Becky and said she was going to submit her letter of resignation that day, but did not want to come by the office. Becky told her to drop the letter by Becky's house, and she would bring Jayme her therapist license. Early that afternoon, Becky sent the McElheneys an email message telling them she had learned Jayme intended to resign.[13]

---

[13]As previously mentioned, Billy prepared a playlist of songs that were played during his massages with Jayme. The playlist was on an iPod in the sound closet at Soyokaze, and was titled with Jayme's and Billy's initials, "J and B," and a warning, "No Public Allowed." Before Jayme resigned, she told Becky about the playlist. Becky found the playlist on the iPod and took a photo of the iPod screen showing its title. On Thursday, after Jayme resigned, Becky sent that photo to Jayme's step-father at his request. Jayme had informed her step-father of her allegations, and he became angry and contacted Becky asking to see the name of the playlist that contributed to Jayme's feeling of being harassed and singled out for inappropriate attention. Jayme's step-father was the local sheriff, and it would have been difficult for Becky to have denied his request. Similarly, after Jayme told Becky about what occurred with Billy, but before Jayme resigned, Becky sent Jayme a copy of her client list; Jayme would have had access to her client list at that

A few days after leaving Soyokaze, Jayme contacted a lawyer for legal advice and eventually filed suit against Billy, Support, and Soyokaze for sexual harassment. There was no evidence that Becky told, insinuated, suggested, or even hinted to Jayme that she should seek legal advice, much less file suit against the Plaintiffs and Billy. On the contrary, the evidence established that Becky tried to mitigate, not exacerbate, the possibility of litigation in what became the State Lawsuit.

In Jayme's Deposition taken in the State Lawsuit, she was asked, "Why did you file this lawsuit?" She answered unequivocally, and with no mention of Becky:

> I filed this lawsuit because I was harassed by my boss who is running a massage studio full of females and I just—I—I don't—I don't think it's right. I think that he needs to have some limits. And I think that he should not be entrusted to be over there all the time alone with females. It's a case in point of he violated me and he could do it to someone else. He runs a massage business.

(Jayme's Deposition, p. 262, 10, 12-20.)[14]

---

time since she was still an employee. The Plaintiffs contend that Becky should not have sent the client list and iPod photo to Jayme and her step-father, and alleged these acts demonstrated Becky's willful and malicious attempts to harm the Plaintiffs. The court disagrees and interpreted these acts as an attempt by Becky, as HR coordinator, to reduce the intensity of a very emotional situation. A "stonewall" approach would have aggravated the situation and possibly provoked a further investigation by the step-father, but in his official capacity. And the McElheneys' complaint about disclosing the playlist begs the question: Did they intend to covertly destroy the playlist to cover-up evidence of Billy's misdeeds? Regardless, the Plaintiffs did not demonstrate how they were harmed by Becky obliging Jayme's and her step-father's requests. Renee admitted that the Plaintiffs had no proof that sending Jayme her client list had any impact on Soyokaze's business. There was no evidence that the photo of the playlist title was further disclosed and used to harm the Plaintiffs, and there was no convincing evidence that Jayme used the client list to her advantage when she opened her own massage business two months later across the street from Soyokaze. On the contrary, Jayme testified in her deposition that her customers sought her out. Customers who previously went to Jayme at Soyokaze could look across the street and see her new location.

[14] When Jayme's Deposition was taken, Becky had already left Support, but the Plaintiffs and McElheneys had not yet sued Becky. Thus there was no reason for Jayme to protect Becky by concealing any involvement Becky might have had in Jayme's decision to file the State Lawsuit. In fact it would have made Jayme's claim stronger if she had testified that the HR coordinator told

9-*Becky Resigns; Mysterious Anatomy Book*

On Wednesday, May 18, Becky sent an email message to all Support employees telling them that her husband, Tim, would soon be transitioning out of his current position as youth minister with their church and that she would likewise be transitioning away from Support during the next few months, and anticipated being gone by August. (Plaintiffs' Ex. 24.) Earlier, she sent a draft of the message to Renee for her approval before sending it to Support's staff.[15] Becky then sent a message to Billy telling him of her imminent departure, and he responded with nothing but praise:

> Thank you for everything that you have brought to the table over the years and all the help that you have provided, especially for Renee. You have without a doubt extended her life span by several years by helping to relieve her work load and just being there for her. Thank you for helping her through Tim's and your transition. I know as you begin your journey of following your dreams that you will have no problem achieving them.

(Plaintiffs' Ex. 26.) This was not the reply one would expect from a corporate executive who thought his CEO-wife's assistant and HR coordinator was incompetent or attempting to intentionally harm his businesses.

Early on Friday, May 20, out of the blue, Billy asked Becky if she knew the location of a fitness book with a detailed female anatomy section. Becky responded that she had no idea what he was talking about. Nothing more was said about the book, but Billy's inquiry was suspicious in light of his having just learned about Jayme's allegations. That same day, Renee, or someone acting at her direction, moved Becky's desk and yanked the Soyokaze phone from the wall in

---

her that Billy's conduct was sexual harassment and she should go see a lawyer. It bears repeating that there was no evidence Becky participated in Jayme's decision to file the State Lawsuit.

[15] "I ran my 'transition' email by Renee before I sent it so I hope that it is okay with you [Billy] as well." (Plaintiffs' Ex. 25.)

Becky's office, and also directed incoming Support calls to Renee's desk rather than Becky's. During the course of the day, Billy and Renee appeared angry with Becky and pointedly avoided speaking with her. That afternoon, in light of those developments, Becky was concerned and sent a message to Rich Rees, a Support engineer, asking that he not leave her in the office alone with the McElheneys "in this emotionally explosive environment. Billy began asking me questions about stuff [female anatomy book] I have absolutely no knowledge of and I do not want to be cornered after hours." (Plaintiffs' Ex. 30.)

The months-long transition away from Support initially contemplated by Becky, and agreed to by the McElheneys, was not to be. On Saturday, May 21, Becky drafted, and on Sunday, May 22, she submitted her resignation letter. (Plaintiffs' Ex. 31.) Becky realized that she and the McElhaneys were too incompatible to work together any longer, especially in light of their treatment of her and the atmosphere in the office on Friday. In her letter she requested six months' severance pay and agreed to sign a confidentiality agreement. Support's Employee Handbook provided that severance pay was available on a case-by-case basis in the company's discretion, and Becky knew of at least two employees who had been fired for serious offenses, but nevertheless were given up to four months' severance pay as well as insurance covering the same amount of time. She hoped, but did not expect, she would be offered at least a month's salary.[16]

---

[16] Years earlier, Becky worked for IBM and other large companies, and she observed that key personnel often signed confidentiality agreements as part of their severance. She made the offer to sign a confidentiality agreement to reassure Billy and Renee that after resigning she would not disclose sensitive or proprietary information. However, the McElheneys interpreted Becky's offer as a threat that she would disclose the Jayme matter if her request was not honored. Soon after Becky's resignation, Tim returned some items the McElheneys had loaned to the Wallaces and the church youth group. Plaintiffs' counsel questioned Tim about why he mentioned 1 Corinthians 6* when he met with the McElheneys on that occasion. Tim explained he told Renee that regardless of the McElheneys' decision regarding Becky's request for severance pay, the Wallaces would abide by the directives of that Bible verse, as they had no thought of taking the McElheneys to court regardless of whether Becky was paid a severance. Becky was not paid a

No severance was paid and no confidentially agreement was signed, and Becky left Support, Soyokaze, and the McElheneys believing that unpleasant chapter of her life was behind her. But the McElheneys were not about to let Becky leave quietly.[17]

## 10-*Jayme Sues Support, et al.*

Although not a surprise given the circumstances, after she resigned, Jayme filed a complaint on September 7, 2011 against the Plaintiffs with the U.S. Equal Employment Opportunity Commission. (Plaintiffs' Ex. 38.) The EEOC complaint was consistent with Jayme's Deposition testimony and Becky's trial testimony:

> On May 13, 2011, at approximately 5 p.m. [Jayme] made her initial complaint about [Billy's] conduct to Becky [ ]. [Jayme] was visibly upset and told [Becky] that she needed to speak privately with her. They agreed to meet on Saturday morning.
> The next day, she advised [Becky] that she had serious problems with the

---

severance and she did not sign a confidentially agreement; however, there was no evidence that after she left Support she disclosed the Jayme matter to anyone other than in defending litigation commenced by the Plaintiffs and the McElheneys. *("If any of you has a dispute with another, do you dare to take it before the ungodly for judgment instead of before the Lord's people? Or do you not know that the Lord's people will judge the world? And if you are to judge the world, are you not competent to judge trivial cases? Do you not know that we will judge angels? How much more the things of this life! Therefore, if you have disputes about such matters, do you ask for a ruling from those whose way of life is scorned in the church?" 1 *Corinthians* 6: 1-4 NIV).

[17] As she was leaving Support, Becky returned her company cell phone, from which she deleted personal information. She did the same with her company computer. There was testimony that she shredded documents, which she and everyone else in the office did on a daily basis even before the Jayme matter occurred, but there was no credible evidence that anything of value, or anything that could be considered company property or proprietary, was deleted or destroyed. There was no credible evidence that anything shredded was not also backed up on the company's large server, as Becky testified. The Plaintiffs made an unsupported last-minute claim that Becky "wiped clean" the hard drive on her computer as she was leaving, with the help of two disenchanted engineers; Renee admitted Becky did not have the skill to do so on her own. Considering the large number of email messages from Becky that the Plaintiffs offered as exhibits, it is obvious that the later claim was founded on nothing but spite and sour grapes.

behavior of [Billy].  She detailed most of her allegations as set out in Exhibit "A" for [Becky], and advised her that his conduct was unwelcome and amounted to sexual harassment.  She further stated that she felt threatened by him and felt as though she would lose her job if she refused to continue to give him massages.

[Becky] promised [Jayme] that she would handle her complaints promptly and seek to address them with the owners.  In fact, [Becky] did take [Jayme's] complaints to Billy and Renee [ ], and expressed her serious concerns about the allegations.  [Billy] responded angrily to the allegations and told [Becky] that he would "take care of Jayme."  This dispute, along with other instances of [Billy] undermining Becky's [ ] ability to deal with other female employees' concerns, led [Becky] to resign.  [Jayme] also resigned as it was clear that her complaints had created a significant controversy and would not be resolved.  . . . .

(Plaintiffs' Ex. 38.)

Soon after the EEOC complaint, and as previously mentioned, Jayme filed the State Lawsuit against Billy and the Plaintiffs.  Following mediation, the State Lawsuit was ultimately settled pursuant to a Settlement, Release and Indemnity Agreement dated August 28, 2014. (Plaintiffs' Ex. 106.)  In exchange for a full release of the "Released Defendant Parties," Jayme was paid $13,750 as "payment of all Plaintiff's attorneys' fees, expenses and court cost."  The definition of "Released Defendant Parties" included Support, Soyokaze, Billy and Renee, and their affiliates.

## 11-*Employee Handbook and Board of Directors*

As briefly mentioned, after Becky joined Support, but before Soyokaze was organized, she and the McElheneys prepared an Employee Handbook that was distributed to all Support employees. (Plaintiffs' Ex. 50.)  The Plaintiffs argued that had Becky simply followed the guidelines in the Handbook, their problems with Jayme would have been amicably resolved.  The court disagrees, and finds that to the extent practical, Becky followed the Handbook complaint procedure, but to no avail; a recap of Becky's actions disproves the Plaintiffs' argument.[18]

---

[18]  To state the obvious, if Billy had abided by section 15:2 of the Handbook that provides sexual "harassment will not be tolerated," the sordid situation never would have occurred in the

Jayme first reported Billy's abusive and harassing conduct to Becky on a Saturday. The following Monday, the next business day, Becky went to Support's lawyer for advice on what to do about a disturbing complaint by a Soyokaze employee made against Billy, one of Soyokaze's owners and executive officers. The lawyer told Becky to follow Support's Employee Handbook.

Section 15:2 of the Handbook provides that if an employee experiences sexual harassment, she should "notify [her] supervisor [Billy or Renee] and/or the Human Resources representative [Becky]." It continues: "If the complaint involves someone in your direct line of supervision [Billy], then you should inform another supervisor [Renee] or your Human Resources representative [Becky] of the complaint. . . . All supervisors/managers are required to immediately report any incidents of harassment, as set forth in our Complaint Policy." The Complaint Procedures were found in section 16:1, and provide that "[o]nce a complaint has been made, the Board of Directors working with Human Resources will determine how to handle it."

The day after talking with Support's lawyer, Becky met with the McElheneys and reported Jayme's allegations, but her message was not well received, and the McElheneys offered no advice to Becky on how she should proceed. In fact, Renee, Support's CEO, did not even wait for Becky to finish her report, but left the meeting as soon as she realized the topic was a sexual harassment claim against Billy. There were three or four board members: the two McElheneys plus Rich Rees and possibly David Humble.[19] After reporting to the McElheneys, Becky phoned both Rees and

---

first place. And Soyokaze's printed employee policies prohibited sexual harassment: "Sexual harassment will not be tolerated. Any instances should be reported immediately to the Administrator." (Plaintiffs' Ex. 49, p. 2.)

[19] Rees and Humble were employed as engineers with Support. Becky testified that Renee instructed her to remove Humble from the board prior to Jayme's allegations, although Becky had not prepared the paperwork to do so when the Jayme matter was reported. Becky was unsure of Humble's status in light of Renee's instructions, and she expressed that uncertainty to Humble out of an abundance of caution and not as an attempt to further sour the relationship between Humble

Humble and informed them that a complaint had been made against Billy, but she did not provide them with details. They apparently did not push Becky for more details and certainly did not offer any advice on how she should handle the situation. Thus, Becky followed the uninspired advice of Support's lawyer, and she complied with the Handbook's notification provisions as closely as was practical, but no one was willing to step up and offer her specific advice on how to proceed under these bizarre circumstances, which should come as no surprise when you consider the lawyer, Rees, and Humble knew the McElheneys and that coming to Becky's rescue would likely have been considered treason.

After all was said and done, Becky had talked with Jayme and the McElheneys about the allegations, which Billy never denied, and she had observed firsthand Billy's unwarranted and excessive attentiveness toward Jayme. In addition to talking with the McElheneys, Becky talked with Support's lawyer, and the two other board members as the Handbook required. As the HR coordinator, Becky made an offer of accommodation to Jayme in an effort to defuse the hostile situation, but to no avail. Renee asked for a meeting with Jayme, but for good reason, Jayme refused to meet unilaterally with the McElheneys. With eyes wide open and being fully informed, the McElheneys—owners, board members, executives, parties with the most to lose—buried their heads in the sand, and did nothing aside from isolating Becky in the days following the revelation of Jayme's claims. Becky, while expecting some fallout, and maybe even the ultimate loss of her job, was caught off guard by the vehemence of the McElheneys' reaction and attack against her. It is preposterous that the Plaintiffs now blame Becky for a predicament of their principals' own making.

---

and Renee. Renee denied she had given those instructions to Becky. Although of no consequence to this proceeding, Humble's deposition testimony, discussed *infra*, supports Becky.

As a smokescreen, the Plaintiffs complained that Becky did not prepare a written report of her investigation. Other than documenting Billy's philandering behavior that no doubt would have been discovered in Jayme's State Lawsuit, a written report would have changed nothing. In the tumultuous days between learning of Jayme's allegations and realizing she had no future at Support, Becky indeed did not prepare a written report of Jayme's allegations. The Handbook's procedure looked good on paper, but it offered no practical help for this farcical situation.

There were no guidelines in the Handbook for handling a sexual harassment complaint when the harasser, together with his wife, owned and controlled the business and reacted with hostility toward the person they put in charge of receiving such complaints. It is ludicrous for the Plaintiffs to now complain that the letter of the Handbook was not followed, when its material terms were in fact followed by Becky in a genuine effort to protect the Plaintiffs and the McElheneys, to the extent practicable.[20] Billy was confronted with embarrassing accusations that he, at least in this adversary proceeding, did not deny.[21] Complicit with his wife, he instead lashed out at Becky in an effort to divert attention away from a predicament of his own making. In fact, it was the McElheneys who violated the Handbook by striking out at Becky: "The Company will not retaliate, or allow retaliation, against anyone who . . . assists in a harassment investigation."

---

[20] The Handbook provides, "Those who are found to have violated this policy [against sexual harassment] will be subject to appropriate disciplinary action, up to and including termination." Rhetorically one might ask whether Renee would have followed up and fired her husband, had Becky prepared a written report.

[21] Renee testified that Billy denied the accusations in the State Lawsuit, which was dismissed with prejudice and without an admission of guilt as the result of a settlement achieved through mediation. Lawsuits are often settled without an express admission of fault, and it's worth repeating that Billy never testified to give his firsthand account of what occurred between Jayme and him.

(Plaintiffs' Ex. 50, ¶ 15:2.)  They have now pursued Becky from Texas to Alabama in an amazingly vigorous campaign to punish her for doing what the Handbook actually required her to do.

## 12-*Rich Rees's Vacation Pay*

The McElheneys were not satisfied with only blaming Becky for the debacle caused by Billy's indiscretions that led to Jayme's tumultuous departure and the State Lawsuit. Totally unrelated to their claims associated with Jayme, the Plaintiffs also alleged that Becky, as HR coordinator, was responsible for willfully and maliciously inciting one of their former employees to make a claim for his accrued and unused vacation.

On May 17, 2011, Rich Rees, an engineer with Support and one of its board members, asked Becky, as HR coordinator, to provide him with the number of unused vacation days he had accrued.  Prior to that time, Rees and Renee had discussed what to do about the vacation days he had not taken, and Becky was aware of their discussions.  Becky sent Rees an email in response to his request for the information, stating that he had 21 weeks of unused vacation time.  She never suggested he would be paid for unused vacation if he left Support or otherwise.  Almost two years later, on March 3, 2013, Rees left Support, and when he was not paid for his unused vacation days, as he claimed Renee—not Becky—had promised, he filed a wage claim with the Texas Workforce Commission.  Support successfully defended the claim, but it now wants Becky to pay the attorneys' fees it expended defending Rees's claim.

During her testimony, Renee never denied that Rees had not taken his allotted vacation days, although she complained he had not accounted for the two weeks during which he attended company-sponsored trips.  Renee testified that Becky was wrong about unused vacation time carrying over from year to year, and that Becky willfully and maliciously gave Rees the 21- weeks figure to provoke him to pursue compensation from Support, thus creating a debt not subject to

discharge under Code § 523(a)(6). The court does not agree, and finds that Becky had no ill motive, but instead gave Rees the information to correctly convey what the vacation records disclosed—one of Becky's duties as HR coordinator.

On May 6, 2011—before responding to Rees's inquiry about his unused vacation and before the bombshell conversation with Jayme—Becky sent a newsletter to all employees, including Renee and Billy, explaining Support's vacation policy. The newsletter stated that "Vacation time *can* be carried over if work scheduling necessitates that it cannot all be taken in one year." (Plaintiffs' Ex. 14, emphasis in original.) If the vacation policy as interpreted by Becky was wrong, neither of the McElheneys took the time to correct her error and tell their employees the accurate vacation policy.

Plaintiffs' Exhibit 50 appeared on its face, and was described on the Plaintiffs' Amended Exhibit List (AP Doc. 60) as the "Technical Support Employee Handbook," and it was admitted into evidence by agreement. Plaintiffs' Exhibit 50 was not offered as an "unadopted" version of the Handbook, and was referred to often by the Plaintiffs during the first two days of trial, with no indication it was anything other than the Handbook in effect during the times material to their claims against Becky.[22] Section 9:3 of the Handbook—Plaintiffs' Ex. 50—provided, "As a general rule, unused vacation time *does* carry over to the next year of employment." (emphasis added.) Renee testified that Exhibit 50, the Plaintiffs' exhibit, was a draft of the Handbook that predated the version later adopted and implemented. The implication was that Becky knowingly gave Rees the earlier, unadopted version, to falsely establish that unused vacation would carry over from year

---

[22] This is the same version of the Employee Handbook that the Plaintiffs claim Becky did not follow when investigating and reporting Jayme's claim of sexual harassment. There was no claim that the provisions dealing with sexual harassment were different from an earlier version.

to year, when the updated version that was later adopted did not so allow. Renee did not testify when she believed Becky gave the unadopted version of the Handbook to Rees, and most critically never offered (or produced in discovery) a copy of the version of the Handbook she asserted was later adopted and implemented. There was no credible evidence of why a copy of the adopted Handbook in effect when Rees made his claim, which, according to the Plaintiffs, was distributed, reviewed, and signed by all employees, was not produced. In fact, there was no corroborating evidence supporting Renee's testimony that Becky was complicit in Rees's claim for unused vacation. Renee's testimony was incredulous.

In any event, neither section 9:3 of the Handbook—the unadopted version according to Renee—nor the newsletter mentioned above, said anything about Support paying employees for unused vacation time when they left their employment. The Plaintiffs' failure to produce a current version of the Handbook—assuming there was such a thing—and Renee's failure to offer any corroborating evidence that Becky was guilty of purposely supplying Rees with an unadopted version of the Handbook, caused the court to conclude that Renee's testimony with regard to the Handbook was a fabrication and undermined the credibility of all her testimony in this proceeding.

### 13-*Plaintiffs Sue Becky in U.S. District Court and Bankruptcy Court*

The Wallaces left Midlothian. Tim became the associate pastor of a small church in north Alabama and Becky took another administrative assistant position, this time in the medical field in Birmingham. But the McElheneys were far from finished with Becky. In December 2014, over three and a half years after Becky left Support, the Plaintiffs sued Becky in the U. S. District Court for the Northern District of Texas, (the "Federal Lawsuit") blaming Becky for a multitude of

injuries and damages they claimed she caused during her final days at Support.[23]   Many of the claims made in the Federal Lawsuit mirrored those made in this adversary proceeding. Nonetheless, in an attempt to finally get a fresh start—and rid themselves of the McElheneys—the Wallaces filed for chapter 7 bankruptcy relief in this court.  The Plaintiffs, under the direction of the McElheneys, were not deterred.  They commenced this adversary proceeding against Becky in her bankruptcy case claiming substantial damages and alleging those damages should not be discharged under Code § 523(a)(6).

14-<u>David Humble and Board of Directors</u>

In addition to Becky, the Plaintiffs sued David Humble ("Humble") and his affiliate, Humble Design, LLC, as co-defendants in the Federal Lawsuit.  Humble was an engineer with Support, and, according to Renee, one of its board members during the time Becky and Jayme worked for the Plaintiffs.   Humble continued to work with Support after Becky and Jayme resigned, but over two years later, he also resigned.  Portions of Humble's deposition, taken in the Federal Lawsuit on March 29, 2016, were designated by the parties as evidence.   Humble's testimony supports the court's conclusion that the essence of this adversary proceeding is a vexatious act of revenge against Becky.  The following is some of what Humble had to say:

Q.  Okay. What was the reason why you didn't want to be in the office?

A.  I didn't like the atmosphere.

Q.  What was the atmosphere?

A.  Hostile.

Q.  Towards you?

A.  Towards me, me towards them [the McElheneys].

---

[23] A copy of the complaint filed against Becky by the Plaintiffs in the Federal Lawsuit was attached as an exhibit to the original complaint filed in this adversary proceeding.  (AP Doc. 1.)

Q.  Why were you hostile toward them?

A.  I had hostile feelings towards them because I, I – I just don't like the way they conduct business.

Q.  Okay.  Was that a feeling that developed as a result of the issues with Becky Wallace and Jayme Rankin or was this something that you felt before?

A.  For me, the deal with Becky and – involving Jayme was kind of like the final straw.  I mean, just seeing the way they reacted towards that and – and on top of the fact that, you know, again, I just felt I couldn't trust Billy to be honest with me or anything –

Q.  Okay.

A.  -- so I just didn't want to be around them.

Q.  When you say, "the way that they reacted," what was it about the way that they reacted that you felt was inappropriate to the Jayme Rankin matter?

A.  The way this whole lawsuit's going on.  I mean they're just very – very vindictive and mean.  I mean, I mean, good grief, why are they going after Becky when she's already claimed bankruptcy?  I mean, that's – it's – it's just mean.  I don't understand.

(Humble Deposition pp. 170-71.)

Q.  Now, you mentioned earlier that you – when Becky spoke to you about the meeting with the McElheneys, she said she felt scared, I believe is how you put it, correct?

A.  Yes.

Q.  That was what she represented to you?

A.  Yes.

Q.  She said that she felt attacked?

A.  Well, yes. Yeah.  She felt that – she was caught off guard.  She didn't realize they would attack so vehemently.

(Humble Deposition p. 178.)

Q.  What about – Okay.  And you got – you said you got angry at the meeting?

A. Well, again because of the way he [Billy] just totally ripped her [Becky] apart. I mean, it was – it just seemed very cruel to me.

Q. Okay.

A. And, again, you know, these events happened so quickly. I mean one minute I think they're best friends, the next minute he's [Billy] ripping her [Becky] apart, you know, and she's telling me about how she's scared to death of them and all that, it's just kind of abrupt. I mean, it just –

(Humble Deposition pp. 180-81.)

Humble further testified in his deposition that he told Billy, before the Jayme matter in May 2011, that he wanted off Support's board of directors. Humble stated that he did not trust Billy, and as early as 2007 considered leaving Support before actually doing so in July 2013, after fourteen years with Support. The McElheneys' treatment of Becky was only one of the reasons for Humble's growing distrust and disenchantment with Support and the McElheneys. Another Support engineer and board member, Rich Rees, left Support in early 2013, which was the watershed event that prompted Humble to finally leave Support, as he had been considering doing for many years.

Humble testified in his deposition that on the day Becky submitted her resignation letter— May 22, 2011—Billy held a meeting of Support's board of directors. According to Humble, Billy presented the letter to the board, and took the opportunity to conduct a character assassination of Becky. In a different meeting, held early the following week, Billy met with Humble, Rees, and Kevin Griffin[24] in the conference room at Support, and Billy's remarks about Becky at that time were so cruel and extreme that Humble became angry with Billy.

---

[24] Griffin testified at trial that he was Support's airplane pilot and a member of its board of directors. Apparently he was made a board member after Becky resigned.

Humble also testified that Becky had not provided Rees and him—board members—with details regarding the employee complaint that turned out to be Jayme's, and that Billy failed to provide any particulars when asked, choosing instead to viciously castigate Becky for not taking his side. Humble and Rees went to the county courthouse and read Jayme's complaint filed in the State Lawsuit to get her version of events.[25]

Becky's demonstrated restraint when talking to Support's lawyer and board members was not the action of a woman intent on spreading salacious gossip. Jayme and Humble, as stated in their depositions, noticed the malicious treatment accorded Becky in her last days with Support. The growing lack of respect Jayme and Humble had for the McElheneys was a result of the McElheneys' treatment of Becky, not anything Becky had done or failed to do.

## Damages

In their original complaint filed in this adversary proceeding (AP Doc. 1), the Plaintiffs itemized with specificity the amount of damages they allegedly suffered "[a]s a result of [Becky's] intentional, systematic, and malicious actions": $254,815.62 lost profits for the years 2011 through 2014; $510,884.96 lost customer accounts; $65,179.40 and $3,308.13 defending claims made by Jayme and Rees; plus unspecified damages for the "tarnished and irreparably damaged" business reputations of the Plaintiffs and the McElheneys. The Plaintiffs amended their complaint (AP Doc. 94) and dropped their itemized claims for lost profits and lost customer accounts, but still claimed $65,179.40 and $3,308.13 they spent defending Jayme's sexual harassment claims and

---

[25] If the McElheneys wanted Rees and Humble to know all the details of Jayme's allegations they had every opportunity to call a meeting of the board and instruct Becky to disclose everything she knew, and Billy could have likewise given his side of the story. That no such meeting occurred cannot be blamed on Becky.

Rees's claim for unpaid vacation. They continued to allege the Plaintiffs' and the McElheneys' business reputations had been tarnished and irreparably damaged. The amended complaint concluded with a prayer for "compensatory, consequential, incidental, and exemplary damages" and a non-dischargeable judgment in favor of the Plaintiffs "in the amount determined by the Court."

Notwithstanding that there was no credible proof that Becky was liable to the Plaintiffs as a consequence of the events alleged in their amended complaint, even if liability had been proven, the proof of damages offered at trial was totally inadequate. The Plaintiffs never offered evidence that the costs of defending claims made by Jayme and Rees, primarily attorneys' fees, were reasonable.[26] All that was offered was the amount of fees allegedly expended by the Plaintiffs. And the Plaintiffs made no attempt to place a monetary value on the damages they allegedly suffered to their business reputations, and any damages suffered by the McElheneys personally were not relevant—individually, they were not parties to this proceeding.[27]

---

[26] Although the amended complaint no longer specified the amount of damages claimed for lost profits and customer accounts, the court assumed the Plaintiffs continued to seek damages for those claims as part of their "compensatory, consequential, incidental, and exemplary damages to which [the Plaintiffs] are entitled." (AP Doc. 94.) Without regard to the Plaintiffs' failure to prove liability, they likewise failed to prove damages for lost profits or customer accounts.

[27] There was another subtle indication of what this proceeding was really all about. At the end of the trial, the court questioned Plaintiffs' counsel about the lack of credible proof of the dollar amount of her clients' damages. She replied that perhaps the court could enter a judgment for nominal damages, thus assigning guilt to Becky. This left the court with the impression that what the Plaintiffs and McElheneys really wanted was a court order they can point to as proof that it was Becky, and not the McElheneys, who were to blame for the Jayme fiasco and later departure of their long-time engineers. Based on the Wallaces' bankruptcy schedules, it would be absurd to believe they could pay the damages claimed by the Plaintiffs in the original complaint. (AP Doc. 1.) But the Plaintiffs and McElheneys are looking for a scape goat, not a viable source of payment.

## Analysis and Conclusions

The Eleventh Circuit summarized the standards for examining whether a debtor inflicted a willful and malicious injury under Code § 523(a)(6) as follows:

> A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition. But this 'fresh start' policy is only available to the 'honest but unfortunate debtor.' " *Kane*, 755 F.3d at 1292 (citation omitted). To this end, Congress enacted several exceptions to the general rule of discharge. *Id.* One of those exceptions is contained in § 523(a)(6), which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

> This Court has explained that a debtor commits a "willful" injury when "he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *Kane,* 755 F.3d at 1293 (quoting *Jennings*, 670 F.3d at 1334); *see also Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998) (holding that § 523(a)(6) requires the actor to intend the injury, not just the act that leads to the injury). We have determined that "malicious" means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Jennings*, 670 F.3d at 1334 (quotation marks and citation omitted). For the purposes of § 523(a)(6), "malice can be implied." *Kane*, 755 F.3d at 1294 (internal brackets, quotation marks, and citation omitted). "Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice." *In re Ikner*, 883 F.2d 986, 991 (11th Cir. 1989).

*In re Monson*, 661 F. App'x 675, 682–83 (11th Cir. 2016).

Soon after an adversary proceeding is filed, including this one, the court reviews the initial pleadings—the plaintiff's complaint and the defendant's answer—for a basic understanding of the allegations, defenses, and issues. After reading the Plaintiffs' original complaint and the accompanying Federal Lawsuit complaint attached as an exhibit, and even after reading the amended complaint, the court was left with the impression that if the Plaintiffs' allegations were proven, Becky would be exposed as a vindictive and vengeful person who was not deserving of

the fresh-start discharge reserved for an honest but unfortunate bankruptcy debtor.[28]  After three days of trial, the opposite was proven.  Becky was honest and indeed unfortunate; she was unfortunate to have become involved with the Plaintiffs and the McElheneys, especially Soyokaze.  It is the Plaintiffs, and their principals, the McElheneys, who were shown to be vindictive and vengeful.  Instead of facing the consequences of Billy's behavior and their own choices of how they did business, the Plaintiffs and the McElheneys attempted to fabricate a distraction with Becky being the object of their diversionary tactics.  Their approach was not unlike a bank robber who starts a fire at the opposite end of town in hopes of drawing attention away from the scene of the robbery.

What was proven at trial, and what the court finds, was that Becky tried her best to ameliorate an incendiary situation that was totally Billy's fault.  The McElheneys were informed of Jayme's allegations, but did nothing to avoid the foreseeable consequences of Billy's conduct.  Becky made an accommodation offer to Jayme—no more massaging Billy and he would keep his distance—which mirrored what Renee said she herself would have offered, but in any event was rejected by Jayme.  There was nothing willful or malicious in Becky's handling of Jayme's complaint.  It was the Plaintiffs, under the direction of the McElheneys, who stood by and did nothing aside from alienating Becky to the point that she resigned.  But regardless of how you judge Becky's talents as an HR coordinator, there was a total absence of credible evidence that she suggested or otherwise caused Jayme to pursue legal action against the Plaintiffs and Billy.

And the same can be said about Rees's claim for his unused vacation time.  Rees asked Becky to determine how many vacation weeks he had not used—it was Becky's job to keep up

---

[28] As advice for giving a dubious public speech, someone once said, "If you can't be good, be loud."  The Plaintiffs' pleadings were loud, but their proof was muted.

with employees' vacation time. She simply told him how much time he had accrued. She never told him he would be paid for his unused vacation weeks. Two years later he resigned, and made his claim based on his belief that Renee had refused to pay the settlement amount they had agreed to, with no suggestion that Becky had done anything other than provide him the information he requested. Rees's complaint with the Texas Workforce Commission disclosed his claim was motivated by Renee's decision to not pay him for vacation time, despite what he believed was their agreement to the contrary. There was nothing willful or malicious in Becky's supplying Rees with the number of vacation days shown in her records.

As for their tarnished reputations, to the extent the Plaintiffs' reputations suffered in the wake of the events occurring in May 2011, and the loss of key personnel, the Plaintiffs can blame the McElheneys.

Thus, the court concludes there is no debt owing by Becky to the Plaintiffs, there was no injury suffered by the Plaintiffs as the result of Becky's conduct, and that Becky's conduct was neither willful nor malicious. Because there is no debt and no injury, there is nothing to declare nondischargeable under Code § 523(a)(6). Although the court's conclusions resolve the claims made by the Plaintiffs against Becky, there is one remaining matter to be addressed.

The financial fresh start offered to the honest but unfortunate individual debtor is the essence of chapter 7 bankruptcy relief.[29] Expounding upon the fundamental objectives of the bankruptcy system, the Eleventh Circuit quoted the Supreme Court: "To begin with, the [Supreme] Court provided guidance by setting forth the three *critical* in rem functions of bankruptcy courts:

---

[29] "Section 524 of the bankruptcy code provides the debtor with a post-discharge injunction against collection of debts discharged in bankruptcy, and thus embodies the 'fresh start' concept of the bankruptcy code. This provision is the barrier that prevents creditors from reaching the debtors' wages, property or assets." *In re Hardy*, 97 F.3d 1384, 1388–89 (11th Cir. 1996).

'[1] the exercise of exclusive jurisdiction over all of the debtor's property, [2] the equitable distribution of that property among the debtor's creditors, and [3] the ultimate discharge that gives the debtor a "fresh start" by releasing him, her, or it from further liability for old debt.'" *State of Florida v. Diaz (In re Diaz)*, 647 F.3d 1073, 1084 (11th Cir. 2011) (quoting *Central Virginia Community College v. Katz*, 546 U.S. 356, 363-64 (2006) (emphasis added)). While the Wallaces' prepetition debts have been discharged, and Becky owes nothing to the Plaintiffs, it is almost certain that her fresh start was substantially impaired due to the expenses she incurred defending this frivolous adversary proceeding pursued by the Plaintiffs for illegitimate purposes.

### Attorneys' Fees – An Exception to the American Rule

The court's findings set forth above demonstrate, and the court explicitly concludes, that this action was pursued in bad faith, as an act of harassment, by the Plaintiffs under the guidance of their corporate officers, for vexatious, wanton, and oppressive reasons. The Plaintiffs were not motivated by a desire to recover their losses from a wrongdoer and dishonest debtor based on a legitimate claim, but rather their aim was to cast blame on someone who innocently found herself in an untenable position.

Writing for the majority in *Marx v. General Revenue Corp.,* 568 U.S. 371, 382 (2013), Justice Thomas stated, "Under the bedrock principle known as the 'American Rule,' each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise. Notwithstanding the American Rule, however, we have long recognized that federal courts have inherent power to award attorney's fees in a narrow set of circumstances, including when a party brings an action in bad faith." (internal citations and quotations omitted). The Eleventh Circuit has condoned exceptions to the American Rule in cases such as this adversary proceeding:

> Courts have the inherent power to impose attorneys' fees when a party acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S. Ct. 2123, 115 L.Ed.2d 27 (1991). A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43, 111 S. Ct. 2123. A party acts in bad faith when he "knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).

*Hayden v. Vance*, No. 16-15326, 2017 WL 3912490, at *2 (11th Cir. Sept. 7, 2017). "[E]very judicial and quasi-judicial body has the right to award attorneys' fees under the common law bad faith exception to the 'American Rule.'" *Marshall & Co. v. Duke*, 114 F.3d 188, 188–90 (11th Cir. 1997). "In assessing whether an award is proper under the bad faith standard, 'the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case.'" *Perry v. Orange Cty.*, 341 F. Supp. 2d 1197, 1207 (M.D. Fla. 2004) *(quoting Rothenberg v. Security Management Co., Inc.,* 736 F.2d 1470, 1472 (11th Cir.1984)).

Becky will not receive the meaningful financial fresh start she deserves, if she is left to bear the expense of defending this adversary proceeding.[30] Rule 7054(b)(2) provides that Federal Rule of Civil Procedure 54(c) applies to adversary proceedings, and the latter states, "Every . . . final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Unless the Plaintiffs can demonstrate otherwise, it appears the relief to which Becky is entitled should include not only a judgment in her favor on the merits of the Plaintiffs' claims, but also an award of her attorneys' fees and expenses. And Code § 105(a) provides that "[n]o provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any

---

[30] Having lost their case on the merits, saddling Becky with substantial attorneys' fees, and thereby denying her a financial fresh start, may be an acceptable consolation prize for the Plaintiffs.

36

determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." The commencement and prosecution of this proceeding by the Plaintiffs was an abuse; thus it would be easy to conclude that fairness, justice, and equity will support Becky's recovery of the attorneys' fees and expenses she incurred in defending the Plaintiffs' claims. Nonetheless, Becky has not yet sought to recover her attorneys' fees, and if she does, the Plaintiffs deserve an opportunity to demonstrate why such a recovery is not warranted.

### Entry of Judgment and Procedure for Becky to Seek Assessment of Fees and Expenses

Pursuant to Rule 7058, the court will enter a separate judgment conforming to this opinion. Moreover, because the court has found that this adversary proceeding was pursued by the Plaintiffs in bad faith, and for the purpose of harassing Becky, it will entertain Becky's motion seeking an award of the attorneys' fees and expenses she incurred in defending this adversary proceeding, should she choose to do so. Any such motion should be filed within fourteen days from the entry of this opinion and conforming judgment, and include an application for fees and expenses substantially in the form prescribed by Rule 2016 and the court's local rules. No doubt the Plaintiffs will disagree; thus they will be given an opportunity to demonstrate that an assessment of fees and expenses is not warranted. If Becky files a motion seeking attorneys' fees and expenses, the court will hold a hearing to consider whether it should be granted.

Done this 16th day of November 2017.

/s/ James J. Robinson
JAMES J. ROBINSON
CHIEF UNITED STATES BANKRUPTCY JUDGE